## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OFFICE FOR PLANNING | : | |
| AND ARCHITECTURE, INC. and | : | |
| BRET PETERS, | : | 1:20-cv-00920 |
| | : | |
| Plaintiffs, | : | |
| | : | Hon. John E. Jones III |
| v. | : | |
| | : | |
| CITY OF HARRISBURG and | : | |
| WALLACE, MONTGOMERY AND | : | |
| ASSOCIATES, LLP, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM</u>

### November 24, 2020

Presently pending before the Court is a Motion to Dismiss filed by Defendants City of Harrisburg (the "City") and Wallace, Montgomery and Associates, LLP ("Wallace Montgomery") (the "Motion"). (Doc. 13). The Motion has been fully briefed, (Docs. 28, 31, 34), and is ripe for disposition. For the reasons that follow, the Motion shall be granted.

## I.    BACKGROUND

In accordance with the standard of review applicable to a motion to dismiss, the following facts are derived from Plaintiffs' complaint, (Doc. 1), and viewed in the light most favorable to them.

Plaintiff Office for Planning and Architecture, Inc. ("OPA") and the City entered into a written contract on May 1, 2015, in which the City agreed to pay OPA for professional land use and planning services (the "Agreement").  (Doc. 1 at ¶¶ 10–11).  Specifically, the City desired from OPA a new "comprehensive land plan" for Harrisburg.  (*Id.* at ¶ 11).  The Agreement was set out in a "customized version of the American Institute of Architects Standard Form of Architect's Services: Regional or Urban Planning."  (*Id.* at ¶ 10; Doc. 1-2).

Article 3 of the Agreement covers "Copyrights and Licenses."  (Doc. 1-2 at 6).  Section 3.1, in relevant part, states that OPA and the City agree that "in transmitting Instruments of Service [the "Work Product"], or any other information, the transmitting party is the copyright owner of such information or has permission from the copyright owner to transmit such information for its use on the Project."  (*Id.*).  Section 3.2 deems OPA and its "consultants" as the "authors and owners of their respective Instruments of Service, including the Drawings and Specifications," and that OPA and its consultants "shall retain all common law, statutory and other reserved rights, including copyrights."  (*Id.*).  Section 3.2 also states that  "[s]ubmission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of" OPA and its consultants.  (*Id.*).

Section 3.3 articulates that "[u]pon execution of" the Agreement, OPA "grants to [the City] a nonexclusive license to use [OPA's Work Product] solely and exclusively for the Project, provided that [the City] substantially performs its obligations, including prompt payment of all sums when due, under this Agreement." (*Id.*). OPA "shall obtain similar nonexclusive licenses" from its consultants "consistent with this Agreement." (*Id.*). Section 3.3 also states that "[t]he license granted under this section permits [the City] to authorize [its consultants and contractors] to reproduce applicable portions of the [Work Product] solely and exclusively for use in performing services for the Project and for Publication in the Comprehensive Plan or in connection therewith." (*Id.*). If OPA "rightfully terminates [the Agreement] for cause as provided in Section 5.4," then the license granted in this section "shall terminate." (*Id.*).

Article 5 of the Agreement deals with "Termination or Suspension." (*Id.* at 8). Section 5.1 provides that failure by the City to make payments to OPA "in accordance with the Agreement . . . shall be considered substantial nonperformance and cause for termination, or, at [OPA's] option, cause for suspension of performance of services." (*Id.* at 8). A suspension of services requires seven days' written notice to the City, and, under Section 5.3, if the project is suspended more than 90 days, then OPA "may terminate" the Agreement with no less than seven days' written notice.

3

Section 5.4 then outlines the procedure for termination of the Agreement: either party "may terminate" the Agreement "upon not less than five days' written note should the other party fail substantially to perform in accordance with the terms of th[e] Agreement through no fault of the party initiating the termination[.]" (*Id.*).  Section 5.8 provides that in the event of termination, the City's "rights to use" the Work Product "are set forth in Article 3."  (*Id.*).  In other words, pursuant to Section 3.3, upon "rightful terminat[ion]" of the Agreement by OPA, the City's nonexclusive license to the Work Product "shall terminate."  (*Id.* at 6).

Pursuant to the Agreement, OPA first "coordinat[ed] and faciliat[ed] a public planning process," and then based on that information, "prepared draft chapters for a municipal comprehensive plan in accordance with the scope of work set forth in the City's request for proposal and consistent with" the state municipal code's requirements for municipal comprehensive plans.  (Doc. 1 at ¶ 13).  The Work Product was authored by Plaintiff Bret Peters ("Peters"), who is president and majority (51%) shareholder of OPA.  (*Id.* at ¶¶ 14, 30).  Peters granted OPA a "nonexclusive license for use of the Work Product" for OPA to perform its Agreement with the City.  (*Id.* at ¶ 14).

According to Plaintiffs, sometime in 2016 the City "refused to pay for the Work Product as required under the Agreement."  (*Id.* at ¶ 15).  Plaintiffs allege that the City owed OPA $109,754.84 as of November 15, 2019.  (*Id.*).

4

On June 28, 2019, the City issued Request for Proposal 2019-3 (the "RFP"), in which the City solicited proposals "to provide professional services to support the Planning Commission in completing the development of a long-range Comprehensive Plan for the City."  (*Id.* at ¶ 16; Doc. 1-4 at 5).  The RFP made explicit reference to the Work Product, noting that a "third-party consulting firm" had prepared a "draft plan which has been vetted by the Planning Commission" and which now required "editing, reformatting, and completing . . . for public review."  (Doc. 1 at ¶ 17; Doc. 1-4 at 6).  In other words, the RFP was not seeking "a proposal for full development of a comprehensive plan," but "instead . . . [sought] services involv[ing] editing/revisions as requested by [the City's Planning Commission] to existing document draft."  (Doc. 1 at ¶ 19; Doc. 1-4 at 5).  The City selected Defendant Wallace Montgomery, an engineering firm, to carry out the work described in the RFP.  (Doc. 1 at ¶ 23).

Plaintiff Peters, on November 18, 2019, "secured in his personal name [a] federal copyright protection over the Work Product[.]"  (*Id.* at ¶ 30; Doc. 1-6).  The next month, on December 20, counsel for OPA "transmitted a letter to both defendants advising of infringement of OPA's copyright" due to the City and Wallace Montgomery's continued use of the Work Product despite the City's failure to fully pay for it.  (Doc. 1 at ¶¶ 25, 27, 29).  Plaintiffs allege that "OPA has

used the Work Product as Peters' licensee and is [therefore] authorized to enforce Peters' copyright thereto." (*Id.* at ¶ 26).

Plaintiffs filed the instant action on June 5, 2020, alleging that Defendants violated the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, "by unlawfully reproducing and distributing identical copies of, and product derived from, the Work Product," despite Peters' exclusive rights and OPA's nonexclusive licensure rights to that Work Product. (*Id.* at ¶¶ 35–44). Plaintiffs seek to permanently enjoin Defendants from further infringing on their copyrighted Work Product, and additionally request damages for historical infringement as well as attorneys' fees and costs. (*Id.* at 10). Plaintiffs subsequently filed a Motion for Preliminary Injunction on June 16, 2020. (Doc. 5).[1]

Defendants filed the instant Motion to Dismiss on July 8, 2020, (Doc. 13). Following a status conference and the withdrawal of defense counsel due to potential conflicts, we stayed the matter for a period of sixty days for Defendants to obtain new counsel. (Doc. 20). Defendants indeed obtained new representation, and the parties then collaborated on a new briefing schedule for the pending Motion. (Docs. 24, 25). Subsequently, on October 16, 2020, Defendants filed a

---

[1]     Because we will grant the Motion *sub judice* and dismiss this action, the Motion for Preliminary Injunction will be denied as moot; there will be no need for a hearing on the preliminary injunction motion.

brief in support of the Motion, (Doc. 28), to which Plaintiffs responded with an opposition brief on October 29, (Doc. 31).  Defendants filed a reply brief on November 11.  (Doc. 34).  Accordingly, the Motion is ripe for our adjudication. For the reasons that follow, we shall grant the Motion.

## II.    STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint, . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirement of Rule 8(a).  Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds

upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint attacked by Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level…."  *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  Accordingly, to satisfy the plausibility standard, the complaint must indicate that defendant's liability is more than "a sheer possibility."  *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions."  *Twombly*, 550 U.S. at 555, 557.  Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss.  *Iqbal*, 556 U.S. at 679.  Next, the district court must identify "the 'nub' of the … complaint – the well-pleaded, nonconclusory factual allegation[s]."  *Id.*  Taking

these allegations as true, the district judge must then determine whether the complaint states a plausible claim for relief.  *See id.*

However, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips,* 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556–57).  Rule 8 "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

## III.   DISCUSSION

A claim for copyright infringement pursuant to 17 U.S.C. §§ 101, *et seq.*, has two "essential elements": ownership of a copyright and unauthorized copying of that copyrighted work by the defendant.  *Key Consol. 2000, Inc. v. Troost*, 432 F. Supp. 2d 484, 488 (M.D. Pa. 2006) (citing *Dam Things from Den. v. Russ Berrie & Co.*, 290 F.3d 548, 561 (3d Cir. 2002)).  To survive a motion to dismiss, a plaintiff asserting copyright infringement must allege: "(1) which specific original works are the subject of the copyright claim; (2) ownership of the copyrights in those works; (3) registration of the works in question with the Copyright Office in accordance with 17 U.S.C. §§ 101, *et seq*.; and (4) by what acts the defendant infringed the copyright." *Id.*

9

Defendants contend that Plaintiffs' complaint for copyright infringement fails to state such a claim.  First, Defendants argue that OPA lacks standing to assert a copyright infringement claim because it, admittedly, only possess a nonexclusive license in the copyright; according to Defendants, only "owners" of copyrights and those who have been granted exclusive licenses for the copyright have standing to sue for copyright infringement.  (Doc. 28 at 8).  Second, Defendants argue that the City, upon execution of the Agreement, received a nonexclusive license to use the Work Product, and Defendants' alleged use of the Work Product fell within the scope of that nonexclusive license.  (*Id.* at 9). Specifically, Defendants point to Section 3.3 of the Agreement, which granted the City a nonexclusive license "[u]pon execution of [the] Agreement," and that license entitled them to "reproduce applicable portions" of the Work Product "for use in performing services for the Project and for publication in the Comprehensive Plan or in connection therewith."  (*Id.* at 10).   Third and finally, Defendants challenge Plaintiffs' demand for statutory damages and attorneys' fees. (*Id.* at 13).

In response, Plaintiffs argue first that OPA indeed has standing to bring a claim of copyright infringement.  Plaintiffs argue that the Agreement explicitly defines OPA as an "owner" of the Work Product at issue, and therefore may assert a claim for copyright infringement as a "legal or beneficial owner" of the

10

copyright.  *See* 17 U.S.C. § 501(b) ("The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it.").  Plaintiffs also point to the fact that OPA and Peters, who officially registered the Work Product as copyright, are co-plaintiffs, signifying a "unity of purpose and harmony of interests such that OPA is authorized under its assignment to assert a breach of copyright every bit as much as Peters himself could."  (Doc. 31 at 6).

Regarding whether the City continued to possess the nonexclusive license to the Work Product after its alleged failure to pay, Plaintiffs argue that Section 3.3 of the Agreement created a condition precedent to the maintenance of the City's nonexclusive license—that the City substantially perform "all of its obligations under the Agreement," including "the payment of all sums due under the Agreement."  (*Id.* at 9).  Because the City failed to fully pay for the Work Product, neither the City nor Wallace Montgomery continued to hold the rights to its use. (*Id.*).

We begin first with OPA's standing to assert a claim of copyright infringement.  As stated previously, a plaintiff must establish "ownership of a valid copyright" to bring a copyright infringement claim.  *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002).  The

11

Copyright Act permits "[t]he legal or beneficial owner of an exclusive right under a copyright" to "institute an action for infringement[.]  17 U.S.C. § 501(b).  A "beneficial owner" is one who retains an economic interest in the copyright but cannot authorize others to use it.  *See SBK Catalogue P'ship v. Orion Pictures Corp.*, 723 F. Supp. 1053, 1062 (D.N.J. 1989). A granting of a nonexclusive license is not the equivalent of a transfer of ownership.  *See* 17 U.S.C. § 101 ("A 'transfer of copyright ownership' is an assignment, mortgage, *exclusive* license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, *but not including a nonexclusive license*.") (emphasis added); *see also MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 779 (3d Cir. 1991) ("[A] nonexclusive license does not transfer ownership of the copyright from the licensor to the licensee . . . .").

Defendants rely on Plaintiffs' explicit language in their complaint, which plainly states that Peters granted OPA "a nonexclusive license for use of the Work Product" and that "OPA *through license from Peters* holds *nonexclusive rights*, title, and interest in the copyright of the Work Product."  (Doc. 1 at ¶¶ 14, 37). Plaintiffs, on the other hand, rely on the language in Section 3.2 of the Agreement, which provides that OPA and its consultants "shall be deemed the authors *and*

*owners* of their respective Instruments of Service, including the Drawings and Specifications."  (Doc. 1-2 at 6).

Though the apparent tension between the pleadings as drafted by Plaintiffs and the language in the Agreement renders this a moderately close call, we ultimately conclude that OPA has effectively conceded that it lacks standing.  It is axiomatic that allegations contained in a plaintiff's complaint constitute "binding judicial admission[s]."  *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008); *Parilla v. IAP Worldwide Serv., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) ("Judicial admissions are formal concessions in the pleadings, or stipulations by the party or its counsel, that are binding upon the party making them.").  Plaintiffs—multiple times in their complaint—clearly and unequivocally offered to the Court that OPA merely possessed a nonexclusive license to the Work Product.  We are disinclined to displace Plaintiffs' formal judicial admission that OPA as an entity only had nonexclusive rights to the Work Product.

But even if OPA did have standing to bring a copyright infringement claim, Defendants' second argument in favor of dismissal—that they acted within the scope of their nonexclusive license—is dispositive as to both OPA and Peters. Plaintiffs' claim for copyright infringement is premised on the argument that because the City failed to fully pay for the Work Product, the City's rights to the

Work Product through their nonexclusive license became effectively terminated.

The argument is grounded in Section 3.3 of the Agreement, which states:

> Upon execution of this Agreement, [OPA] grants to [the City] a
> nonexclusive license to use [OPA's Work Product] solely and exclusively
> for the Project, provided that [the City] substantially performs its
> obligations, including prompt payment of all sums when due, under this
> Agreement.

(Doc. 1-2 at 6).  Plaintiffs argue that the phrase beginning with "provided that"

created a condition precedent to the City obtaining the nonexclusive license—in

other words, "the license is conditioned on the City's performance of substantially

all of its obligations under the Agreement."  (Doc. 31 at 9).  Because the City

failed to pay OPA, the City (and by extension Wallace Montgomery) had no rights

to use the Work Product and therefore infringed OPA's and/or Peters' copyright.

Plaintiffs' theory, however, is fatally flawed.  Under Pennsylvania law, "an

event mentioned in a contract will not be construed as a condition precedent unless

expressly made such a condition."  *West Development Group, Ltd. v. Horizon

Financial, F.A.*, 592 A.2d 72, 76 (Pa. Super. Ct. 1991).  Indeed, "conditions

precedent are highly disfavored and 'will be strictly construed against the one

seeking to avail himself of them.'"  *Id.* (quoting *Allentown Patriots, Inc. v. City of

Allentown*, 162 A.3d 1187, 1195 (Pa. Commw. Ct. 2017).  Plaintiffs have not

persuaded us that the parties expressly created a condition precedent here.  The

very first words of Section 3.3, in fact, provide that the nonexclusive license is

granted to the City "[u]pon execution of this Agreement."  (Doc. 1-2 at 6).  If the

"provided that" clause created a condition precedent, then the introductory clause

of Section 3.3 would be rendered superfluous.  One of the "cardinal principle[s] of

contract construction" is that "a document should be read to give effect to all its

provisions and to render them consistent with each other."  *Mastrobuono v.*

*Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

Plaintiffs' proposed construction of Section 3.3 would render other

provisions of the Agreement superfluous as well.   The last sentence of Section 3.3

provides that "[i]f [OPA] rightfully terminates this Agreement for cause *as*

*provided in Section 5.4*, the license granted in Section 3.3 shall terminate."  (Doc.

1-2 at 6) (emphasis added).  This is the only mechanism specified in the

Agreement that provides for the termination of the license—the license is *only*

rescinded if OPA rightfully terminates the Agreement for cause.

Article 5 outlines the procedures for terminating or suspending the

Agreement.  Section 5.1 explains that the City's failure to make payments to OPA

"shall be considered substantial nonperformance and cause for termination."  (*Id.*

at 8).  And Section 5.4, in turn, requires "five days' written notice should the other

party fail substantially to perform in accordance with the terms of this Agreement

through no fault of the party imitating the termination[.]  (*Id.*).  Section 5.4 also

allows the defaulting party to avoid termination by remedying the default or even

15

by "diligently attempting to cure such default." (*Id.*).  If Section 3.3 created a condition precedent, and therefore the nonexclusive license rescinded upon substantial non-performance, then these provisions would be rendered wholly superfluous.

The contract, in other words, plainly envisions that substantial non-performance does not *automatically* result in termination of the license.  Rather—according to the explicit language of the Agreement—substantial non-performance, including a failure to pay, would only give the non-defaulting party *cause* to terminate the Agreement, with the license only terminated upon termination.  But for Plaintiffs' theory to work, the termination of the license must have occurred automatically, since Plaintiffs do not allege that they actually terminated the Agreement pursuant to Section 5.4.  Plaintiffs merely plead that the City failed to pay but continued to use the Work Product, thereby infringing on the copyright.  Plaintiffs do not allege that they followed the termination procedures outlined in Section 5.4.  As there is no allegation that the Agreement was ever terminated, then there is similarly no allegation that the nonexclusive license granted in Section 3.3 was ever terminated.[2]

---

[2]     And as long as the City maintained its nonexclusive license, there is no question that its continued use of the Work Product was not unlawful.  Section 3.3 permits the City to "reproduce applicable portions of the [Work Product] . . . for use in performing services for the Project and for publication in the Comprehensive Plan or in connection therewith."  (Doc. 1-2 at 6).

This conclusion—that there was no condition precedent to the City's receipt of the nonexclusive license and Plaintiffs took no action to formally terminate the license pursuant to the Agreement—is bolstered by decisions of other courts, including those construing nearly identical contractual language.  For example, in *Eberhard Architects, LLC v. Bogart Architecture, Inc.*, 314 F.R.D. 567 (N.D. Ohio), a case involving essentially the same provision as Section 3.3 in this dispute, Judge Gaughan similarly ruled that the "provided that . . ." clause which followed the granting of a nonexclusive license "[u]pon execution of the agreement" was *not* a condition precedent.  *Eberhard Architects*, 314 F.R.D. at 572–73.  This clause regarded the "payment of fees" and was more so a "covenant between the parties" rather than "a condition precedent to the existence of the nonexclusive license."  *Id.* at 572.  Because the parties "expressly" agreed that "the nonexclusive license is granted 'upon execution of the Agreement,'" the license necessarily was granted "before full payment was due."  *Id.* at 573.  Ultimately, Judge Gaughan denied defendants' motion to dismiss because the plaintiff had "rightfully terminated the Agreement and, therefore, the parties agreed the license would be revoked."  *Id.*  As discussed, Plaintiffs here do not allege that they

---

Plaintiffs allege that Defendants infringed the copyright simply by using it in connection with the comprehensive plan despite non-payment to OPA.  Since we conclude that the alleged non-payment did not automatically terminate the license, then the City's use of the Work Product fell clearly within the permitted scope of its nonexclusive license.

"rightfully terminated" the Agreement "in a manner agreed to by the parties." *Id.*
Defendants may have breached their covenant with Plaintiffs to fully pay for the
Work Product, but, at least on the pleadings before us, we cannot conclude that the
use of the Work Product despite non-payment amounted to copyright infringement
where Plaintiffs never rescinding the nonexclusive license to use the Work Product
and where Defendants never exceeded the agreed-upon scope of that license.

Several courts in our circuit have reached a similar conclusion—that
contractual fee disputes may provide for contractual remedies but not necessarily
copyright infringement claims. *See, e.g.*, *Lowe v. Loud Records*, 126 F. App'x 545,
547 (3d Cir. 2005) ("Here, assuming arguendo that Lowe could meet that burden,
by his own admissions, he granted a license for Storch to use the beat Lowe claims
to have created.  Given that license, Lowe can not establish a cause of action for
copyright infringement."); *Gillan & Hartmann, Inc. v. Kimmel Bogrette
Architecture ± Site, Inc.*, No. 15-cv-1035, 2015 WL 3444305, at *4 (E.D. Pa. May
28, 2015) ("Because the granting of the exclusive license was not conditioned upon
full payment, Kimmel's failure to fully compensate Plaintiff under the terms of the
Contract sounds in breach of contract, not in copyright."); *AHAdams & Co., P.C. v.
Spectrum Health Services, Inc.*, 40 F. Supp. 3d 456, 460 n.7 (E.D. Pa. 2014) ("The
ongoing fee dispute does not prevent the Court from determining if AHAdams
granted Defendants a nonexclusive license."); *Beholder Productions, Inc. v.*

18

*Catona*, 629 F. Supp. 2d 490, 495 (E.D. Pa. 2009) ("If Defendants have failed to pay invoices owed under the contract—they have breached the contract . . . Defendants, however, could not have infringed on [the plaintiff's] copyright because [the plaintiff] gave Defendants an implied license . . . ."); *Lowe v. Loud Records*, No. 01-cv-1797, 2003 WL 22799698, at *5 (E.D. Pa. Nov. 20, 2003), *aff'd*, 126 F. App'x 545 (3d Cir. 2005) ("[A]n action based upon an alleged licensing agreement, whether seeking an accounting of licensing fees or breach of contract, is not tantamount to a claim for copyright infringement.").

Indeed, Judge Pratter in *AHAdams* noted the unsound implications of finding a copyright infringement in what is better described as a fee dispute.  There, the plaintiff-architect sued for copyright infringement, and defendants argued that they retained an implied nonexclusive license to use the work product following the plaintiff's termination of their agreement.  *AHAdams*, 40 F. Supp. 3d at 459.  The facts in *AHAdams* obviously differ from the present dispute, as the *AHAdams* plaintiff formally terminated the parties' agreement, and defendants argued that it possessed, in part based on prior dealings, an implied license that continued beyond the life of the nonexclusive license granted in their original agreement. But Judge Pratter's analysis is persuasive despite those distinctions.  Drawing on a Ninth Circuit decision, Judge Pratter observed the "illogical result" of siding with plaintiff's argument that it did not grant any implied license to defendants

permitting use of the work product following termination of the original license. Defendants (like the Defendants here) had paid a considerable sum of money to plaintiff for the work product, but under plaintiff's theory, defendants would only be permitted to use the work product thereafter "upon compulsion to continue business with [the plaintiff-architect]." *Id.* at 465.  This would permit "architectural or engineering firms to hold entire projects hostage, forcing the owner either to pay the firm off, continue to employ it, or forego the value of all work completed so far and start from scratch." *Id.* (quoting *Foad Consulting Group, Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 829 n.12 (9th Cir. 2001).

Like in *AHAdams*, we hesitate to sustain a claim for copyright infringement where the allegedly unauthorized use clearly fell within the scope of the original license and the only alleged impropriety was merely the continued use of the work product following a fee dispute.  This conclusion is even more fitting where there is not a single allegation that Plaintiffs ever terminated the Agreement—unlike the plaintiff in *AHAdams*— or rescinded the grant of the nonexclusive license.  And even if Plaintiffs had terminated the Agreement and/or rescinded the license, we would not be legally foreclosed from finding an implied license to continue using the Work Product following termination, as Judge Pratter concluded in *AHAdams*, though we need not reach that holding today.  It is sufficient for present purposes to simply conclude that Plaintiffs have not stated a claim for copyright

infringement under the facts before us.  We will therefore grant the Motion and dismiss the case.[3]

## IV.   CONCLUSION

For the foregoing reasons, we shall grant Defendants' Motion to Dismiss, (Doc. 13).  A separate order shall issue in accordance with this ruling.

---

[3]      As we are granting the Motion to Dismiss, it is not necessary to consider Defendants' arguments regarding the propriety of Plaintiffs' claims for statutory damages and attorneys' fees.